## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | |
|---|---|
| THE CITY OF COLUMBUS, GEORGIA AND THE BOARD OF WATER COMMISSIONERS OF COLUMBUS, GEORGIA d/b/a COLUMBUS WATER WORKS,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE UNITED STATES ARMY CORPS OF ENGINEERS,<br>PRESTON M. GEREN,<br>    Acting Secretary, United States Army,<br>JOHN PAUL WOODLEY, JR.,<br>    Assistant Secretary, United States Army<br>LT. GEN. ROBERT L. VAN ANTWERP,<br>    Commander, U.S. Army Corps of Engineers,<br>BRIG. GEN. JOSEPH SCHROEDEL,<br>    Commander, South Atlantic Division,<br>    U.S. Army Corps of Engineers,<br>COL. BYRON JORNS,<br>    Commander, Mobile District,<br>    U.S. Army Corps of Engineers,<br><br>    Defendants. | Civil No. 4:07-cv-125(CDL) |

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................. 2

JURISDICTION AND VENUE .............................................................. 5

PARTIES ......................................................................................... 5

   The City of Columbus and Columbus Water Works......................... 5

   The United States Army Corps of Engineers............................... 10

430879

FACTUAL ALLEGATIONS ................................................................................ 10

The ACF Basin and the Chattahoochee River ............................................. 10

Instream Flows at Columbus ................................................................... 20

COUNT ONE:  FAILURE TO ADOPT WATER CONTROL PLANS FOR THE ACF

BASIN........................................................................................................ 22

COUNT TWO: NATIONAL ENVIRONMENTAL POLICY ACT................................ 23

COUNT THREE:  WATER RESOURCES DEVELOPMENT ACT (Failure to Provide

Public Review and Comment) ................................................................. 26

PRAYER FOR RELIEF ................................................................................... 27

## COMPLAINT

Plaintiffs the City of Columbus, Georgia, and the Board of Water Commissioners of Columbus, Georgia, d/b/a Columbus Water Works (collectively, "CWW") by and through the undersigned attorneys, file this Complaint against Defendant the United States Army Corps of Engineers, and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action against the United States Army Corps of Engineers (the "Corps") for declaratory and injunctive relief under the Administrative Procedure Acts, 5 U.S.C. §§ 551 *et seq.* (the "APA"), with regard to discrete actions and discrete failures to act of the officers of the United States Army Corps of Engineers responsible for operation and management of the dams, reservoirs, and hydroelectric generating facilities Apalachicola-Chattahoochee-Flint River Basin (the "ACF Basin"), including Lake Sidney Lanier ("Lake Lanier"), West Point Lake, and Lake Seminole.  Plaintiff hereby

FACTUAL ALLEGATIONS ....................................................................... 10

The ACF Basin and the Chattahoochee River .............................................. 10

Instream Flows at Columbus ........................................................................ 20

COUNT ONE:  FAILURE TO ADOPT WATER CONTROL PLANS FOR THE ACF

BASIN............................................................................................................ 22

COUNT TWO: NATIONAL ENVIRONMENTAL POLICY ACT................................ 23

COUNT THREE:  WATER RESOURCES DEVELOPMENT ACT (Failure to Provide

Public Review and Comment) ....................................................................... 26

PRAYER FOR RELIEF .................................................................................. 27

## COMPLAINT

Plaintiffs the City of Columbus, Georgia, and the Board of Water Commissioners of Columbus, Georgia, d/b/a Columbus Water Works (collectively, "CWW") by and through the undersigned attorneys, file this Complaint against Defendant the United States Army Corps of Engineers, and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action against the United States Army Corps of Engineers (the "Corps") for declaratory and injunctive relief under the Administrative Procedure Acts, 5 U.S.C. §§ 551 *et seq.* (the "APA"), with regard to discrete actions and discrete failures to act of the officers of the United States Army Corps of Engineers responsible for operation and management of the dams, reservoirs, and hydroelectric generating facilities Apalachicola-Chattahoochee-Flint River Basin (the "ACF Basin"), including Lake Sidney Lanier ("Lake Lanier"), West Point Lake, and Lake Seminole.  Plaintiff hereby

alleges that each of the acts, and failures to act, described below constitute "final agency action" under the APA and are subject to judicial review by this Court. This case concerns Defendants' failure to adopt a water control plan for the federal reservoirs in the Apalachicola-Chattahoochee-Flint ("ACF") River Basin, and the Corps' unlawful adoption and implementation of an "Interim Operation Plan" for Lake Seminole, in violation of NEPA and the Water Resources Development Act.

2.    Plaintiff Columbus Water Works ("CWW") provides drinking water, stormwater, and wastewater treatment and related services to the City of Columbus, Georgia, and neighboring communities. CWW's service area lies within the ACF Basin. CWW's delivery of services to Columbus and the surrounding area is entirely reliant on the instream flows of the Chattahoochee River.

3.    As required by the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES") program, CWW conducts its wastewater and stormwater discharge operations in compliance with permits issued by the Georgia Department of Natural Resources ("DNR"), Environmental Protection Division ("EPD"). CWW's drinking water withdrawals from the Chattahoochee are also made in compliance with an EPD permit. Any diversion of water that reduces instream flows in the Chattahoochee River at Columbus below the critical low flows on which CWW's permits are based would result in changes to CWW permit requirements such that CWW would have to spend millions of dollars to modify its facilities. Consequently, reliable instream water flows in the Chattahoochee are critically important to CWW.

4.    The Corps' continued operation of the ACF Basin without promulgating a water control plan that meets statutory and regulatory requirements will further diminish

alleges that each of the acts, and failures to act, described below constitute "final agency action" under the APA and are subject to judicial review by this Court.  This case concerns Defendants' failure to adopt a water control plan for the federal reservoirs in the Apalachicola-Chattahoochee-Flint ("ACF") River Basin, and the Corps' unlawful adoption and implementation of an "Interim Operation Plan" for Lake Seminole, in violation of NEPA and the Water Resources Development Act.

2.     Plaintiff Columbus Water Works ("CWW") provides drinking water, stormwater, and wastewater treatment and related services to the City of Columbus, Georgia, and neighboring communities.  CWW's service area lies within the ACF Basin. CWW's delivery of services to Columbus and the surrounding area is entirely reliant on the instream flows of the Chattahoochee River.

3.     As required by the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES") program, CWW conducts its wastewater and stormwater discharge operations in compliance with permits issued by the Georgia Department of Natural Resources ("DNR"), Environmental Protection Division ("EPD").   CWW's drinking water withdrawals from the Chattahoochee are also made in compliance with an EPD permit.  Any diversion of water that reduces instream flows in the Chattahoochee River at Columbus below the critical low flows on which CWW's permits are based would result in changes to CWW permit requirements such that CWW would have to spend millions of dollars to modify its facilities.  Consequently, reliable instream water flows in the Chattahoochee are critically important to CWW.

4.     The Corps' continued operation of the ACF Basin without promulgating a water control plan that meets statutory and regulatory requirements will further diminish

water flows in the ACF River Basin, thereby causing serious and immediate harm to CWW and its customers. This harm includes, *inter alia*, the overall degradation of water quality, impairment of CWW's ability to discharge treated stormwater and wastewater in compliance with regulatory requirements. Moreover, the Corps' management of projects in the ACF Basin, without the guidance of an updated water control plan developed in accordance with statutory and regulatory requirements severely impairs CWW's ability to conduct and rely upon long range planning and analysis in its wastewater treatment operations.

5.      The Corps' adoption and implementation of an Interim Operations Plan ("IOP") for Woodruff Dam without fulfilling the requirements of the National Environmental Policy Act ("NEPA") and the Water Resources Development Act deprived CWW of the opportunity to participate in the Corps' management of vital natural resources in which CWW has direct and substantial interests.

6.      The Corps' failure to comply with its statutory obligations also has resulted in the reduction of instream flows in the Chattahoochee River at Columbus below the level required by CWW to operate its facilities and provide essential services to its customers.

7.      The Corps' violations of the APA and other statutes infringe on CWW's vested rights to make beneficial use of the waters of the Chattahoochee River for purposes of wastewater discharge. If the Court does not grant the requested relief, CWW will suffer irreparable harm.

water flows in the ACF River Basin, thereby causing serious and immediate harm to CWW and its customers. This harm includes, *inter alia*, the overall degradation of water quality, impairment of CWW's ability to discharge treated stormwater and wastewater in compliance with regulatory requirements. Moreover, the Corps' management of projects in the ACF Basin, without the guidance of an updated water control plan developed in accordance with statutory and regulatory requirements severely impairs CWW's ability to conduct and rely upon long range planning and analysis in its wastewater treatment operations.

5.      The Corps' adoption and implementation of an Interim Operations Plan ("IOP") for Woodruff Dam without fulfilling the requirements of the National Environmental Policy Act ("NEPA") and the Water Resources Development Act deprived CWW of the opportunity to participate in the Corps' management of vital natural resources in which CWW has direct and substantial interests.

6.      The Corps' failure to comply with its statutory obligations also has resulted in the reduction of instream flows in the Chattahoochee River at Columbus below the level required by CWW to operate its facilities and provide essential services to its customers.

7.      The Corps' violations of the APA and other statutes infringe on CWW's vested rights to make beneficial use of the waters of the Chattahoochee River for purposes of wastewater discharge. If the Court does not grant the requested relief, CWW will suffer irreparable harm.

- 4 -

## JURISDICTION AND VENUE

8.     This Court has jurisdiction in this action pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

9.     Venue is proper in the United States District Court for the Middle District of Georgia pursuant to 28 U.S.C. § 1391(e)(3).  The Corps is an agency of the United States of America, and plaintiffs reside in this District.

## PARTIES

### The City of Columbus and Columbus Water Works

10.     The City of Columbus is a community of approximately 186,000 individuals, located in on the Chattahoochee River in Muscogee County, Georgia.  The City of Columbus was founded by an Act of the Georgia Legislature in 1828. The City of Columbus is a riparian landowner on the Chattahoochee, possesses riparian rights to these water sources, and is otherwise vested with rights to the same by, *inter alia*, O.C.G.A. §§ 44-8-1 and 44-8-5.[1]

11.     Columbus Water Works is a public water supply and wastewater utility serving 225,000 people in Columbus and Fort Benning, Georgia, the neighboring Georgia counties of Harris and Talbot, and Phenix City, Alabama.  It is responsible for providing the citizens of Columbus and the area with a safe and reliable water supply and for operating the Columbus's sanitary sewer system.  CWW also provides such services to the United States Army post at Fort Benning, Georgia.

---

[1]     The City of Columbus joins as a Plaintiff in this litigation by virtue of CWW's status as a subordinate branch of the Columbus City government.  To the extent that CWW in this litigation may assert procedural or substantive rights that are held by the City, the City of Columbus also asserts those rights.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction in this action pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

9.     Venue is proper in the United States District Court for the Middle District of Georgia pursuant to 28 U.S.C. § 1391(e)(3).  The Corps is an agency of the United States of America, and plaintiffs reside in this District.

## PARTIES

### The City of Columbus and Columbus Water Works

10.     The City of Columbus is a community of approximately 186,000 individuals, located in on the Chattahoochee River in Muscogee County, Georgia.  The City of Columbus was founded by an Act of the Georgia Legislature in 1828. The City of Columbus is a riparian landowner on the Chattahoochee, possesses riparian rights to these water sources, and is otherwise vested with rights to the same by, *inter alia*, O.C.G.A. §§ 44-8-1 and 44-8-5.[1]

11.     Columbus Water Works is a public water supply and wastewater utility serving 225,000 people in Columbus and Fort Benning, Georgia, the neighboring Georgia counties of Harris and Talbot, and Phenix City, Alabama.  It is responsible for providing the citizens of Columbus and the area with a safe and reliable water supply and for operating the Columbus's sanitary sewer system.  CWW also provides such services to the United States Army post at Fort Benning, Georgia.

---

[1]     The City of Columbus joins as a Plaintiff in this litigation by virtue of CWW's status as a subordinate branch of the Columbus City government.  To the extent that CWW in this litigation may assert procedural or substantive rights that are held by the City, the City of Columbus also asserts those rights.

12.   CWW is a subordinate branch of the City of Columbus, established by statute in 1902. *See* 1902 Ga. Laws 370 *et seq*. CWW's principal place of business is in Columbus, Georgia.

13.   CWW has withdrawn water from the Chattahoochee and has discharged treated stormwater and/or wastewater into the river since 1915.

14.   CWW operates its drinking water, wastewater treatment, and storm sewer systems pursuant to permits issued by the Georgia Department of Natural Resources, Environmental Protection Division ("EPD").

15.   CWW first constructed a drinking water treatment plant in Columbus in 1915. Facility upgrades and modifications occurred in 1941, 1944, 1957, 1961, 1965, 1972, 1977, 1986, 1988, 1989, 1991, and 1995. CWW's drinking water system delivers water through 1288 miles of water distribution pipes. CWW's treatment plant has a permitted capacity of 90 million gallons per day ("mgd"). CWW withdraws drinking water from the Chattahoochee at Lake Oliver, pursuant to EPD Surface Water Withdrawal Permit No. 160-1293-05. CWW operates its drinking water distribution system pursuant to EPD Permit No. CS2150000.

16.   CWW's primary wastewater treatment plant, the South Columbus Water Resources Facility, was constructed in 1964, and is operated pursuant to NPDES Permit No. GA0020516. CWW's Sanitary Sewer System now comprises 944 miles of sewer mains, 69 sewage lift stations, the South Columbus Water Resources Facility, and two sewage treatment plants serving Fort Benning. The two plants at Fort Benning are being phased out and their wastewater operations consolidated with operations at the South

- 6 -

12.   CWW is a subordinate branch of the City of Columbus, established by statute in 1902. *See* 1902 Ga. Laws 370 *et seq*. CWW's principal place of business is in Columbus, Georgia.

13.   CWW has withdrawn water from the Chattahoochee and has discharged treated stormwater and/or wastewater into the river since 1915.

14.   CWW operates its drinking water, wastewater treatment, and storm sewer systems pursuant to permits issued by the Georgia Department of Natural Resources, Environmental Protection Division ("EPD").

15.   CWW first constructed a drinking water treatment plant in Columbus in 1915. Facility upgrades and modifications occurred in 1941, 1944, 1957, 1961, 1965, 1972, 1977, 1986, 1988, 1989, 1991, and 1995. CWW's drinking water system delivers water through 1288 miles of water distribution pipes. CWW's treatment plant has a permitted capacity of 90 million gallons per day ("mgd"). CWW withdraws drinking water from the Chattahoochee at Lake Oliver, pursuant to EPD Surface Water Withdrawal Permit No. 160-1293-05. CWW operates its drinking water distribution system pursuant to EPD Permit No. CS2150000.

16.   CWW's primary wastewater treatment plant, the South Columbus Water Resources Facility, was constructed in 1964, and is operated pursuant to NPDES Permit No. GA0020516. CWW's Sanitary Sewer System now comprises 944 miles of sewer mains, 69 sewage lift stations, the South Columbus Water Resources Facility, and two sewage treatment plants serving Fort Benning. The two plants at Fort Benning are being phased out and their wastewater operations consolidated with operations at the South

Columbus Water Resource Facility.  All of the wastewater from Columbus's sanitary sewer system is discharged to the Chattahoochee River.

17.    The City of Columbus operates its Municipal Separate Storm Sewer System pursuant to EPD Permit No. GAS000202.

18.    CWW's Combined Sewer Overflow ("CSO") system consists of two large facilities that treat stormwater and wastewater flowing from collection pipes owned by the City of Columbus. The Uptown Park plant has the capacity to treat 45 mgd, while the South Commons plant can treat up to 73 mgd. All of Columbus's CSO outfalls discharge directly or indirectly into the Chattahoochee River.  CWW operates its CSO System pursuant to NPDES Permit No. GA0036838.

19.    In October 2004, CWW assumed ownership and operation of Fort Benning's drinking water and wastewater services.  The wastewater treatment and discharge plant at Fort Benning operates pursuant to NPDES Permit No. GA0000973.

20.    Pursuant to the Department of Defense's 2005 Defense Base Closure and Realignment Report ("BRAC 2005"), operational units from Fort Knox and Fort Gillem will be relocated to Fort Benning, in a process that will be completed by 2012.  This realignment will result in the direct creation of 9,895 military and civilian jobs, the indirect creation of 4,034 additional jobs, and the relocation of thousands of military and civilian dependents and other family members to Fort Benning and the Columbus area. In all, the BRAC 2005 process will bring an estimated 40,000 new people to Fort Benning and the surrounding area.

21.    The additional personnel at Fort Benning called for by BRAC will substantially increase the demands on the drinking water and wastewater facilities that

Columbus Water Resource Facility. All of the wastewater from Columbus's sanitary sewer system is discharged to the Chattahoochee River.

17. The City of Columbus operates its Municipal Separate Storm Sewer System pursuant to EPD Permit No. GAS000202.

18. CWW's Combined Sewer Overflow ("CSO") system consists of two large facilities that treat stormwater and wastewater flowing from collection pipes owned by the City of Columbus. The Uptown Park plant has the capacity to treat 45 mgd, while the South Commons plant can treat up to 73 mgd. All of Columbus's CSO outfalls discharge directly or indirectly into the Chattahoochee River. CWW operates its CSO System pursuant to NPDES Permit No. GA0036838.

19. In October 2004, CWW assumed ownership and operation of Fort Benning's drinking water and wastewater services. The wastewater treatment and discharge plant at Fort Benning operates pursuant to NPDES Permit No. GA0000973.

20. Pursuant to the Department of Defense's 2005 Defense Base Closure and Realignment Report ("BRAC 2005"), operational units from Fort Knox and Fort Gillem will be relocated to Fort Benning, in a process that will be completed by 2012. This realignment will result in the direct creation of 9,895 military and civilian jobs, the indirect creation of 4,034 additional jobs, and the relocation of thousands of military and civilian dependents and other family members to Fort Benning and the Columbus area. In all, the BRAC 2005 process will bring an estimated 40,000 new people to Fort Benning and the surrounding area.

21. The additional personnel at Fort Benning called for by BRAC will substantially increase the demands on the drinking water and wastewater facilities that

- 7 -

serve Fort Benning. CWW estimates that the BRAC buildup at Fort Benning will increase peak drinking water demand by up to 6.8 mgd and will increase peak sewer discharge by up to 4.5 mgd.

22.   To cope with this increased demand, the military has authorized substantial upgrades to the Fort Benning's infrastructure for drinking water supply and distribution, as well as wastewater collection and treatment. The estimated cost of these improvements is approximately $75,138,000.

23.   CWW's operations in Columbus and at Fort Benning rely entirely on the Chattahoochee River's flow for wastewater assimilation and treatment. Any unlawful action that reduces the flows in the Chattahoochee River below the critical low flows assumed by CWW's permits would result in changes to CWW permit requirements such that CWW would have to spend millions of dollars to modify its facilities. Consequently, reliable instream water flows in the Chattahoochee are critically important to CWW. Further harm from a reduction of instream flows includes the overall degradation of water quality at Columbus, impairment of CWW's ability to discharge stormwater and treated wastewater in compliance with regulatory requirements, and impairment of CWW's ability to conduct and rely upon long range planning and analysis. Consequently, reliable water flows into the ACF River Basin are critically important to CWW.

24.   In 2006, the City of Columbus issued a Request for Proposals for a mixed-use development at Oxbow Meadows, a site on the Chattahoochee approximately seven river miles downstream from downtown Columbus. The proposed development is adjacent to the new location of the National Infantry Museum, which is currently under

serve Fort Benning.  CWW estimates that the BRAC buildup at Fort Benning will increase peak drinking water demand by up to 6.8 mgd and will increase peak sewer discharge by up to 4.5 mgd.

22.    To cope with this increased demand, the military has authorized substantial upgrades to the Fort Benning's infrastructure for drinking water supply and distribution, as well as wastewater collection and treatment.  The estimated cost of these improvements is approximately $75,138,000.

23.    CWW's operations in Columbus and at Fort Benning rely entirely on the Chattahoochee River's flow for wastewater assimilation and treatment.  Any unlawful action that reduces the flows in the Chattahoochee River below the critical low flows assumed by CWW's permits would result in changes to CWW permit requirements such that CWW would have to spend millions of dollars to modify its facilities.  Consequently, reliable instream water flows in the Chattahoochee are critically important to CWW. Further harm from a reduction of instream flows includes the overall degradation of water quality at Columbus, impairment of CWW's ability to discharge stormwater and treated wastewater in compliance with regulatory requirements, and impairment of CWW's ability to conduct and rely upon long range planning and analysis. Consequently, reliable water flows into the ACF River Basin are critically important to CWW.

24.    In 2006, the City of Columbus issued a Request for Proposals for a mixed-use development at Oxbow Meadows, a site on the Chattahoochee approximately seven river miles downstream from downtown Columbus.  The proposed development is adjacent to the new location of the National Infantry Museum, which is currently under

- 8 -

construction. Although it is to include commercial and retail components, the focal point of the Oxbow Meadows development is a proposed marina facility incorporating 315 wet slips and 200 dry-rack storage spaces.

25.    The City of Columbus has acquired approximately 178 acres of land at Oxbow Meadows on which the marina and complimentary facilities are to be constructed. The City has already spent approximately $350,000 in developing the Oxbow Meadows plan, and has committed an additional $10 million to associated improvements to the site.

26.    The Corps is authorized by Congress to maintain a 9-foot-deep, 100-foot-wide navigation channel for the length of the Apalachicola River, and in the Chattahoochee from Lake Seminole to Columbus.

27.    Instream flows at Columbus are generally sufficient to support navigation in that reach of the Chattahoochee. However, the desirability of mooring space – and thus a community marina – in the Chattahoochee at Columbus is heavily influenced by the availability of a navigable channel in the Apalachicola River, because that channel serves as Columbus's connection to the waters of the Gulf of Mexico.

28.    Between 1990 and 2001, the authorized navigation channel in the Apalachicola River was available only 43% of the time.

29.    Although the City of Columbus issued its Request for Proposals in 2006, it has been unable to secure a developer for the project. The most significant impediment to the further development of the Oxbow Meadows site is uncertainty as to the future availability of navigational flows in the Apalachicola River.

- 9 -

construction. Although it is to include commercial and retail components, the focal point of the Oxbow Meadows development is a proposed marina facility incorporating 315 wet slips and 200 dry-rack storage spaces.

25.    The City of Columbus has acquired approximately 178 acres of land at Oxbow Meadows on which the marina and complimentary facilities are to be constructed.    The City has already spent approximately $350,000 in developing the Oxbow Meadows plan, and has committed an additional $10 million to associated improvements to the site.

26.    The Corps is authorized by Congress to maintain a 9-foot-deep, 100-foot-wide navigation channel for the length of the Apalachicola River, and in the Chattahoochee from Lake Seminole to Columbus.

27.    Instream flows at Columbus are generally sufficient to support navigation in that reach of the Chattahoochee.    However, the desirability of mooring space – and thus a community marina – in the Chattahoochee at Columbus is heavily influenced by the availability of a navigable channel in the Apalachicola River, because that channel serves as Columbus's connection to the waters of the Gulf of Mexico.

28.    Between 1990 and 2001, the authorized navigation channel in the Apalachicola River was available only 43% of the time.

29.    Although the City of Columbus issued its Request for Proposals in 2006, it has been unable to secure a developer for the project.    The most significant impediment to the further development of the Oxbow Meadows site is uncertainty as to the future availability of navigational flows in the Apalachicola River.

## The United States Army Corps of Engineers

30.    Defendant the United States Army Corps of Engineers is one of the basic branches of the United States Army.  The Corps' Mobile, Alabama District Office is directly responsible for maintaining and operating federally owned and operated reservoirs in the ACF Basin, including Lake Lanier, West Point Lake, Walter F. George Lake, and Lake Seminole, pursuant to numerous federal statutes.

31.    Defendant Preston M. Geren, the Acting Secretary of the United States Army, has overall responsibility for the Corps, which, among other things, includes responsibility for the management of Buford Dam and other Corps projects on the Chattahoochee.  Defendant John Paul Woodley, Jr. is the Assistant Secretary of the United States Army (Civil Works) and has direct supervisory responsibility for the activities of the Corps.  Defendant Lt. Gen. Robert L. Van Antwerp is the Commander of the Corps who oversees and directs the activities of the Corps.  Defendant Brigadier General Joseph Schroedel is the Corps' South Atlantic Division Commander who oversees and directs the activities of the Corps in the South Atlantic Division, including activities at Corps projects on the Chattahoochee.  Defendant Col. Byron Jorns is the Corps' Mobile, Alabama District Commander who directly oversees and controls the activities of the Corps in the Mobile, Alabama District, including those at Corps projects on the Chattahoochee.  All individual defendants are named in their official capacities.

# FACTUAL ALLEGATIONS

## The ACF Basin and the Chattahoochee River

32.    The Chattahoochee River originates in the mountains of northern Georgia, flows southward to become part of the border between Georgia and Alabama, and joins

### The United States Army Corps of Engineers

30.     Defendant the United States Army Corps of Engineers is one of the basic branches of the United States Army.  The Corps' Mobile, Alabama District Office is directly responsible for maintaining and operating federally owned and operated reservoirs in the ACF Basin, including Lake Lanier, West Point Lake, Walter F. George Lake, and Lake Seminole,  pursuant to numerous federal statutes.

31.     Defendant Preston M. Geren, the Acting Secretary of the United States Army, has overall responsibility for the Corps, which, among other things, includes responsibility for the management of Buford Dam and other Corps projects on the Chattahoochee.  Defendant John Paul Woodley, Jr. is the Assistant Secretary of the United States Army (Civil Works) and has direct supervisory responsibility for the activities of the Corps.  Defendant Lt. Gen. Robert L. Van Antwerp is the Commander of the Corps who oversees and directs the activities of the Corps.  Defendant Brigadier General Joseph Schroedel is the Corps' South Atlantic Division Commander who oversees and directs the activities of the Corps in the South Atlantic Division, including activities at Corps projects on the Chattahoochee.  Defendant Col. Byron Jorns is the Corps' Mobile, Alabama District Commander who directly oversees and controls the activities of the Corps in the Mobile, Alabama District, including those at Corps projects on the Chattahoochee.  All individual defendants are named in their official capacities.

## FACTUAL ALLEGATIONS

### The ACF Basin and the Chattahoochee River

32.     The Chattahoochee River originates in the mountains of northern Georgia, flows southward to become part of the border between Georgia and Alabama, and joins

the Flint River to become the Apalachicola River, which flows through northern Florida into Apalachicola Bay and the Gulf of Mexico. The three interconnected rivers, their tributaries, and their watersheds make up the Apalachicola-Chattahoochee-Flint River Basin (the "ACF Basin").

33.    For most of its length, the Chattahoochee River is regulated by a series of dams. Lake Lanier, a Corps reservoir impounded by Buford Dam, is located approximately 35 miles north of Atlanta. Congress authorized the Corps to develop Buford Dam and Lake Lanier in 1946. Pub. L. No. 525, ch. 595 (July 24, 1946). Buford Dam and Lake Lanier were substantially completed in 1956, although the reservoir did not fill to full power pool until May 1959.

34.    The authorized purposes of Buford Dam and Lake Lanier include flood control, navigation and hydropower.

35.    Approximately 155 miles southwest of Lake Lanier, the Chattahoochee River flows into West Point Lake, a reservoir impounded by West Point Dam. The construction of West Point Dam was authorized by the Flood Control Act of 1962, and the dam was completed in 1975.

36.    Under the Flood Control Act of 1962, P.L. 87-874, 76 Stat. 1180, the authorized purposes of West Point Lake are flood control, hydroelectric power generation, navigation, recreation, water quality, and fish and wildlife conservation.

37.    South of West Point Dam, the Chattahoochee flows past the City of Columbus, and then flows into another Corps reservoir, Lake Walter F. George, which is impounded by the Walter F. George Lock and Dam.

the Flint River to become the Apalachicola River, which flows through northern Florida into Apalachicola Bay and the Gulf of Mexico. The three interconnected rivers, their tributaries, and their watersheds make up the Apalachicola-Chattahoochee-Flint River Basin (the "ACF Basin").

33.     For most of its length, the Chattahoochee River is regulated by a series of dams.   Lake Lanier, a Corps reservoir impounded by Buford Dam, is located approximately 35 miles north of Atlanta.   Congress authorized the Corps to develop Buford Dam and Lake Lanier in 1946. Pub. L. No. 525, ch. 595 (July 24, 1946).  Buford Dam and Lake Lanier were substantially completed in 1956, although the reservoir did not fill to full power pool until May 1959.

34.     The authorized purposes of Buford Dam and Lake Lanier include flood control, navigation and hydropower.

35.     Approximately 155 miles southwest of Lake Lanier, the Chattahoochee River flows into West Point Lake, a reservoir impounded by West Point Dam.   The construction of West Point Dam was authorized by the Flood Control Act of 1962, and the dam was completed in 1975.

36.     Under the Flood Control Act of 1962, P.L. 87-874, 76 Stat. 1180, the authorized purposes of West Point Lake are flood control, hydroelectric power generation, navigation, recreation, water quality, and fish and wildlife conservation.

37.     South of West Point Dam, the Chattahoochee flows past the City of Columbus, and then flows into another Corps reservoir, Lake Walter F. George, which is impounded by the Walter F. George Lock and Dam.

38.     South of Lake Walter F. George, the Chattahoochee River flows into Lake Seminole, the southernmost reservoir within the ACF River Basin, which is impounded by the Jim Woodruff Lock and Dam ("Woodruff Dam").  South of Lake Seminole, the Chattahoochee becomes the Apalachicola River, which flows for approximately 106 miles from Woodruff dam to the Gulf of Mexico at Apalachicola Bay.

39.     The Corps has been authorized to operate Buford Dam, West Point Dam, the Walter F. George Lock and Dam, and Woodruff Dam subject to the requirements of numerous federal statutes and regulations, including the Water Resources Development Acts of 1988 and 1990, 33 U.S.C. §2312, the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.*, and the Flood Control Act of 1944, 33 U.S.C. § 709.

**The Corps' Obligation to Promulgate a Water Control Plan for the ACF Basin**

40.     Federal statute and Corps regulations require the Corps to promulgate plans and manuals for the coordinated operation of all Corps projects in the ACF Basin.

41.     The Flood Control Act of 1944 provides that:

> On and after December 22, 1944, it shall be the duty of the Secretary of the Army to prescribe regulations for the use of storage allocated for flood control or navigation at all reservoirs constructed wholly or in part with Federal funds provided on the basis of such purposes, and the operation of any such project shall be in accordance with such regulations[.]

33 U.S.C. § 709.

42.     The Corps has promulgated 33 C.F.R § 222.5, which "prescribes policies and procedures to be followed by the U.S. Army Corps of Engineers in carrying out water control management activities, including establishment of water control plans for Corps and non-Corps projects, as required by Federal laws and directives."  These

38.     South of Lake Walter F. George, the Chattahoochee River flows into Lake

Seminole, the southernmost reservoir within the ACF River Basin, which is impounded

by the Jim Woodruff Lock and Dam ("Woodruff Dam").   South of Lake Seminole, the

Chattahoochee becomes the Apalachicola River, which flows for approximately 106

miles from Woodruff dam to the Gulf of Mexico at Apalachicola Bay.

39.     The Corps has been authorized to operate Buford Dam, West Point Dam,

the Walter F. George Lock and Dam, and Woodruff Dam subject to the requirements of

numerous federal statutes and regulations, including the Water Resources Development

Acts of 1988 and 1990, 33 U.S.C. §2312, the National Environmental Policy Act of 1969,

42 U.S.C. §§ 4321 *et seq.*, and the Flood Control Act of 1944, 33 U.S.C. § 709.

## The Corps' Obligation to Promulgate a Water Control Plan for the ACF Basin

40.     Federal statute and Corps regulations require the Corps to promulgate

plans and manuals for the coordinated operation of all Corps projects in the ACF Basin.

41.     The Flood Control Act of 1944 provides that:

> On and after December 22, 1944, it shall be the duty of the
> Secretary of the Army to prescribe regulations for the use of
> storage allocated for flood control or navigation at all
> reservoirs constructed wholly or in part with Federal funds
> provided on the basis of such purposes, and the operation of
> any such project shall be in accordance with such
> regulations[.]

33 U.S.C. § 709.

42.     The Corps has promulgated 33 C.F.R § 222.5, which "prescribes policies

and procedures to be followed by the U.S. Army Corps of Engineers in carrying out

water control management activities, including establishment of water control plans for

Corps and non-Corps projects, as required by Federal laws and directives."   These

- 12 -

regulations apply to "all field operating activities having civil works responsibilities," 33
C.F.R. § 222.5(b), including the Corps projects on the ACF River Basin System. 33
C.F.R. § 222.5(o).

43.     The Corps must prepare a "water control plan" for "reservoirs, locks and
dams, reregulation and major control structures and interrelated systems to conform with
objectives and specific provisions of authorizing legislation and applicable Corps of
Engineers reports." 33 C.F.R. § 222.5(f)(1).   "Water control plans include coordinated
regulation schedules for project/system regulation and such additional provisions as may
be required to collect, analyze and disseminate basic data, prepare detailed operating
instructions, assure project safety and carry out regulation of projects in an appropriate
manner." 33 C.F.R. § 222.5(e)(1).

44.     According to Corps regulations, "Water control plans . . . documented in
. . . water control manuals . . . will be revised as necessary to conform with changing
requirements resulting from developments in the project area and downstream,
improvements in technology, new legislation and other relevant factors, provided such
revisions comply with existing Federal regulations and established Corps of Engineers
policy." 33 C.F.R. § 222.5(f)(3).

45.     Where there are several projects in a drainage basin with interrelated
purposes, a "Master Manual" must be prepared.  33 C.F.R. § 222.5(i)(2). The Corps'
projects in the ACF Basin have interrelated purposes.

46.     When a new water control plan is developed or a water control plan is
revised, the Corps is required to sponsor public involvement and public meetings. 33
C.F.R. § 222.5(g)(2)(i)(A). The Corps is also required to provide information to the

regulations apply to "all field operating activities having civil works responsibilities," 33

C.F.R. § 222.5(b), including the Corps projects on the ACF River Basin System. 33

C.F.R. § 222.5(o).

43.    The Corps must prepare a "water control plan" for "reservoirs, locks and

dams, reregulation and major control structures and interrelated systems to conform with

objectives and specific provisions of authorizing legislation and applicable Corps of

Engineers reports." 33 C.F.R. § 222.5(f)(1).  "Water control plans include coordinated

regulation schedules for project/system regulation and such additional provisions as may

be required to collect, analyze and disseminate basic data, prepare detailed operating

instructions, assure project safety and carry out regulation of projects in an appropriate

manner." 33 C.F.R. § 222.5(e)(1).

44.    According to Corps regulations,  "Water control plans . . . documented in

. . . water control manuals . . . will be revised as necessary to conform with changing

requirements resulting from developments in the project area and downstream,

improvements in technology, new legislation and other relevant factors, provided such

revisions comply with existing Federal regulations and established Corps of Engineers

policy." 33 C.F.R. § 222.5(f)(3).

45.    Where there are several projects in a drainage basin with interrelated

purposes, a "Master Manual" must be prepared.  33 C.F.R. § 222.5(i)(2). The Corps'

projects in the ACF Basin have interrelated purposes.

46.    When a new water control plan is developed or a water control plan is

revised, the Corps is required to sponsor public involvement and public meetings. 33

C.F.R. § 222.5(g)(2)(i)(A). The Corps is also required to provide information to the

public concerning proposed water control management decisions "at least 30 days in advance of a public meeting." 33 C.F.R. § 222.5(g)(2)(i)(C).

47.    The existing water control plan for the ACF Reservoirs was compiled in 1959, before completion of all the Corps reservoirs on the Chattahoochee. Therefore, the existing Master Manual does not include a system-wide water control plan for the ACF Reservoirs.

48.    The Corps has long recognized the need to prepare water control plans for the ACF Reservoirs.   The Corps prepared a draft Water Control Plan for the ACF Reservoirs in 1989, but this plan was never finalized.

49.    On March 6, 2006, the Assistant Secretary of the Army for Public Works sent a letter to U.S. Senators from Alabama, Georgia, and Florida stating that the process of updating water control plans for the ACF Reservoirs would begin in April 2006 with the issuance of a formal notice. No such notice was ever issued.

50.    Upon information and belief, the Corps has taken no further action to update water control plans for the ACF Reservoirs.

## The Interim Operations Plan

51.    On March 7, 2006, the Corps requested the initiation of formal consultation with the U.S. Fish and Wildlife Service ("FWS"), pursuant to Section 7 of the ESA, on the Corps' existing operations at Jim Woodruff Dam, the Corps-operated dam on the Georgia-Florida border.

52.    The March 7, 2006 request stated that the Corps had previously intended to initiate ESA consultation "for existing water control operations within the ACF system, as well as formal consultation for proposed updates or revisions to water control

public concerning proposed water control management decisions "at least 30 days in advance of a public meeting." 33 C.F.R. § 222.5(g)(2)(i)(C).

47.    The existing water control plan for the ACF Reservoirs was compiled in 1959, before completion of all the Corps reservoirs on the Chattahoochee. Therefore, the existing Master Manual does not include a system-wide water control plan for the ACF Reservoirs.

48.    The Corps has long recognized the need to prepare water control plans for the ACF Reservoirs. The Corps prepared a draft Water Control Plan for the ACF Reservoirs in 1989, but this plan was never finalized.

49.    On March 6, 2006, the Assistant Secretary of the Army for Public Works sent a letter to U.S. Senators from Alabama, Georgia, and Florida stating that the process of updating water control plans for the ACF Reservoirs would begin in April 2006 with the issuance of a formal notice. No such notice was ever issued.

50.    Upon information and belief, the Corps has taken no further action to update water control plans for the ACF Reservoirs.

### The Interim Operations Plan

51.    On March 7, 2006, the Corps requested the initiation of formal consultation with the U.S. Fish and Wildlife Service ("FWS"), pursuant to Section 7 of the ESA, on the Corps' existing operations at Jim Woodruff Dam, the Corps-operated dam on the Georgia-Florida border.

52.    The March 7, 2006 request stated that the Corps had previously intended to initiate ESA consultation "for existing water control operations within the ACF system, as well as formal consultation for proposed updates or revisions to water control

plans necessary to implement water supply reallocations in the basin," but that the Corps
had been precluded from doing so by agreements, interstate compacts, and litigation. The
letter explained that the Corps intended to update the water control plans for the ACF
Reservoirs to reflect existing operations, and formally consult regarding those plans, as
part of implementation of a settlement in *Southeastern Federal Power Customers v.
Caldera*, 00-CV-02975 (D.D.C. filed Dec. 12, 2000),[2] and that the scope of the present
consultation was limited to operations at Woodruff Dam for the remainder of calendar
year 2006 and until formal Section 7 consultation could be completed on water control
plans for the ACF Basin. This existing, supposedly temporary, regime for operating
Woodruff Dam came to be referred to as the Interim Operations Plan ("IOP").

53.     In the March 7, 2006 letter, the Corps disclosed its intention to operate in
accordance with the IOP pending completion of Section 7 consultation on the Corps'
"existing water control plans for the ACF Basin." The Corps further stated: "These
interim operations concentrate on operations and releases from Jim Woodruff Dam to the
Apalachicola River, taking into consideration composite storage available in upstream
reservoirs but not addressing detailed operations at the upstream reservoirs. Such
detailed operations would be addressed during the future update of the existing water
control plans for the ACF basin."

54.     The IOP dictates the volume of releases from Woodruff Dam during
certain periods and under certain conditions, and constrains the rate at which the Corps

---

[2]     As a member of the Middle Chattahoochee River Users, a non-legal entity representing various
governmental, industrial, environmental, and ecological entities along the Chattahoochee between West
Point Lake and Woodruff Dam, CWW sought leave to file an amicus brief in opposition to court approval
of the settlement agreement in the District of Columbia case. *See Southeastern Federal Power Customers
v. Caldera*, 00-CV-02975 (Docket No. 157) (Jan. 16, 2004). The court approved the settlement agreement
without ruling on the Middle Chattahoochee River Users' motion for leave to appear *amicus curiae*.

plans necessary to implement water supply reallocations in the basin," but that the Corps

had been precluded from doing so by agreements, interstate compacts, and litigation. The

letter explained that the Corps intended to update the water control plans for the ACF

Reservoirs to reflect existing operations, and formally consult regarding those plans, as

part of implementation of a settlement in *Southeastern Federal Power Customers v.

Caldera*, 00-CV-02975 (D.D.C. filed Dec. 12, 2000),[2] and that the scope of the present

consultation was limited to operations at Woodruff Dam for the remainder of calendar

year 2006 and until formal Section 7 consultation could be completed on water control

plans for the ACF Basin. This existing, supposedly temporary, regime for operating

Woodruff Dam came to be referred to as the Interim Operations Plan ("IOP").

53. In the March 7, 2006 letter, the Corps disclosed its intention to operate in

accordance with the IOP pending completion of Section 7 consultation on the Corps'

"existing water control plans for the ACF Basin." The Corps further stated: "These

interim operations concentrate on operations and releases from Jim Woodruff Dam to the

Apalachicola River, taking into consideration composite storage available in upstream

reservoirs but not addressing detailed operations at the upstream reservoirs. Such

detailed operations would be addressed during the future update of the existing water

control plans for the ACF basin."

54. The IOP dictates the volume of releases from Woodruff Dam during

certain periods and under certain conditions, and constrains the rate at which the Corps

---

[2]      As a member of the Middle Chattahoochee River Users, a non-legal entity representing various
governmental, industrial, environmental, and ecological entities along the Chattahoochee between West
Point Lake and Woodruff Dam, CWW sought leave to file an amicus brief in opposition to court approval
of the settlement agreement in the District of Columbia case. *See Southeastern Federal Power Customers
v. Caldera*, 00-CV-02975 (Docket No. 157) (Jan. 16, 2004). The court approved the settlement agreement
without ruling on the Middle Chattahoochee River Users' motion for leave to appear *amicus curiae.*

may reduce the river stage in the Apalachicola River by reducing releases from Woodruff Dam. However, the Corps' request for consultation stated that Woodruff dam "is essentially a 'run-of-river' project with very limited storage capabilities," and that releases from upstream reservoirs such as Lake Lanier and West Point Lake would be required to meet the demands of the IOP. The IOP thus materially affects releases from and reservoir levels not only at Woodruff Dam, but also at Lake Lanier, West Point Lake, and Walter F. George Lake.

55.    The Corps developed the IOP without any public input, opportunity for public comment, or public hearings. The Corps first gave notice of the IOP by issuing it in final form in the March 7, 2006 letter.

56.    The Corps began applying the IOP to the operation of the ACF Reservoirs in March 2006. Although the IOP is supposedly an "interim" plan, the Corps' cover letter to the FWS for the IOP states that the IOP will remain in effect indefinitely, "until additional formal consultation is completed in association with the update and revision of water control plans for the ACF system."

57.    In June 12, 2006 letter to the FWS, the Corps announced substantial changes to the IOP and shifted the focus of the Section 7 consultation with the FWS from the Corps' pre-IOP operations to the revised IOP. The Corps subsequently adopted the proposed modifications to the IOP ("IOP Revision 1").

58.    On June 21, 2006, the State of Florida filed a motion for temporary restraining order against the Corp in *Alabama v. U.S. Army Corps of Engineers*, then pending in the United States District Court for the Northern District of Alabama.[3]  *See*

---

[3]       A number of the claims in that case, along with several other cases pertaining to the controversy over the waters of the ACF Basin, have since been transferred by the Judicial Panel on Multi-District

may reduce the river stage in the Apalachicola River by reducing releases from Woodruff Dam. However, the Corps' request for consultation stated that Woodruff dam "is essentially a 'run-of-river' project with very limited storage capabilities," and that releases from upstream reservoirs such as Lake Lanier and West Point Lake would be required to meet the demands of the IOP. The IOP thus materially affects releases from and reservoir levels not only at Woodruff Dam, but also at Lake Lanier, West Point Lake, and Walter F. George Lake.

55.     The Corps developed the IOP without any public input, opportunity for public comment, or public hearings. The Corps first gave notice of the IOP by issuing it in final form in the March 7, 2006 letter.

56.     The Corps began applying the IOP to the operation of the ACF Reservoirs in March 2006. Although the IOP is supposedly an "interim" plan, the Corps' cover letter to the FWS for the IOP states that the IOP will remain in effect indefinitely, "until additional formal consultation is completed in association with the update and revision of water control plans for the ACF system."

57.     In June 12, 2006 letter to the FWS, the Corps announced substantial changes to the IOP and shifted the focus of the Section 7 consultation with the FWS from the Corps' pre-IOP operations to the revised IOP. The Corps subsequently adopted the proposed modifications to the IOP ("IOP Revision 1").

58.     On June 21, 2006, the State of Florida filed a motion for temporary restraining order against the Corp in *Alabama v. U.S. Army Corps of Engineers*, then pending in the United States District Court for the Northern District of Alabama.[3] *See*

---

[3]     A number of the claims in that case, along with several other cases pertaining to the controversy over the waters of the ACF Basin, have since been transferred by the Judicial Panel on Multi-District

*Alabama v. Corps of Engineers*, 90-CV-1331 (N.D. Ala. filed June 28, 1990) (the "Alabama Case"). Judge Karon O. Bowdre granted Florida's motion on June 22, 2006, and entered an order requiring the Corps to maintain minimum releases of 8,000 cfs from Woodruff Dam.

59.    Between June 23 and June 29, 2006, Judge Bowdre entered a series of orders revising the June 22 temporary restraining order and gradually lowering the minimum flow from 8,000 cfs to 6,000 cfs.

60.    From June 30 to July 24, 2006, the Corps suspended operation under the IOP and began to operate instead under the terms of an Interim Reservoir Management Agreement that was negotiated among certain parties to *Alabama v. Corps of Engineers*.

61.    On July 25, 2006, the Interim Reservoir Management Agreement expired and the Corps resumed operations under the IOP.

62.    Based on the results of its consultation with the FWS on IOP Revision 1, the Corps on September 7, 2006 announced another revision to the IOP, hereinafter referred to as "IOP Revision 2."

### The Corps' Post-Hoc NEPA Documentation for the IOP

63.    In October 2006, the Corps issued its NEPA documentation for the IOP, consisting of an Environmental Assessment and Finding of No Significant Impact.

64.    In the Environmental Assessment on the IOP, the Corps concluded that the IOP would not significantly affect reservoir levels, water supply, or recreation in Lakes Lanier, West Point, and Walter F. George.

---

Litigation to the United States District Court for the Middle District of Florida. *In re Tri-State Water Rights Litigation*, 07-md-01 (M.D.Fla. filed Mar. 21, 2007).

*Alabama v. Corps of Engineers*, 90-CV-1331 (N.D. Ala. filed June 28, 1990) (the "Alabama Case"). Judge Karon O. Bowdre granted Florida's motion on June 22, 2006, and entered an order requiring the Corps to maintain minimum releases of 8,000 cfs from Woodruff Dam.

59.     Between June 23 and June 29, 2006, Judge Bowdre entered a series of orders revising the June 22 temporary restraining order and gradually lowering the minimum flow from 8,000 cfs to 6,000 cfs.

60.     From June 30 to July 24, 2006, the Corps suspended operation under the IOP and began to operate instead under the terms of an Interim Reservoir Management Agreement that was negotiated among certain parties to *Alabama v. Corps of Engineers*.

61.     On July 25, 2006, the Interim Reservoir Management Agreement expired and the Corps resumed operations under the IOP.

62.     Based on the results of its consultation with the FWS on IOP Revision 1, the Corps on September 7, 2006 announced another revision to the IOP, hereinafter referred to as "IOP Revision 2."

## The Corps' Post-Hoc NEPA Documentation for the IOP

63.     In October 2006, the Corps issued its NEPA documentation for the IOP, consisting of an Environmental Assessment and Finding of No Significant Impact.

64.     In the Environmental Assessment on the IOP, the Corps concluded that the IOP would not significantly affect reservoir levels, water supply, or recreation in Lakes Lanier, West Point, and Walter F. George.

---

Litigation to the United States District Court for the Middle District of Florida. *In re Tri-State Water Rights Litigation*, 07-md-01 (M.D.Fla. filed Mar. 21, 2007).

65.     The Finding of No Significant Impact on the IOP states that because the IOP will not have any significant human or environmental impacts, an Environmental Impact Statement is not required.

## IOP Revision 3

66.     On February 16, 2007, the Corps notified the FWS that it had modeled and was proposing another modification to the IOP ("IOP Revision 3"). The Corps stated that under IOP Revision 3, the Corps would "provide for a higher desired minimum flow of 6,500 for normal to wet years," lower the minimum flow from Woodruff Dam to 5,000 cfs when composite storage in the ACF Reservoirs falls below a certain threshold, and lower "the storage/flow thresholds during the March-May spawning period to 35,800 cfs and 18,000 cfs, respectively."

67.     The FWS announced its approval of Revision 3 on February 28, 2007.

## The Corps' Post-Hoc NEPA Documentation for Revision 3

68.     The Corps prepared an Environmental Assessment of Revision 3 on March 6, 2007.   In the Environmental Assessment, the Corps concluded that IOP Revision 3 would have no adverse impact upon elevations of the ACF Reservoirs, water supply, recreation, or other needs in the ACF Basin.

69.     The Corps also stated that the IOP will "provide adequate flows for the estimated assimilative capacity needs on the Chattahoochee River near Columbus, Georgia." Hydrological models relied on by the Corps in the preparation of the EA assume minimum instream flows at Columbus of 1200 cfs.

65.    The Finding of No Significant Impact on the IOP states that because the IOP will not have any significant human or environmental impacts, an Environmental Impact Statement is not required.

### IOP Revision 3

66.    On February 16, 2007, the Corps notified the FWS that it had modeled and was proposing another modification to the IOP ("IOP Revision 3"). The Corps stated that under IOP Revision 3, the Corps would "provide for a higher desired minimum flow of 6,500 for normal to wet years," lower the minimum flow from Woodruff Dam to 5,000 cfs when composite storage in the ACF Reservoirs falls below a certain threshold, and lower "the storage/flow thresholds during the March-May spawning period to 35,800 cfs and 18,000 cfs, respectively."

67.    The FWS announced its approval of Revision 3 on February 28, 2007.

### The Corps' Post-Hoc NEPA Documentation for Revision 3

68.    The Corps prepared an Environmental Assessment of Revision 3 on March 6, 2007.   In the Environmental Assessment, the Corps concluded that IOP Revision 3 would have no adverse impact upon elevations of the ACF Reservoirs, water supply, recreation, or other needs in the ACF Basin.

69.    The Corps also stated that the IOP will "provide adequate flows for the estimated assimilative capacity needs on the Chattahoochee River near Columbus, Georgia." Hydrological models relied on by the Corps in the preparation of the EA assume minimum instream flows at Columbus of 1200 cfs.

70.     In a Finding of No Significant Impact dated March 6, 2007, the Corps

concluded that IOP Revision 3 "would have no significant environmental human impacts.

Therefore, an environmental impact statement is not required."

71.     In the March 2007 Environmental Assessment, the Corps stated that "[t]he

proposed action [Revision 3] is not a new water control plan for Woodruff Dam[.]"

### The Corps' Over-Releases

72.     As a result of the Corps' application of the IOP, the Corps increased

releases of water from reservoirs in the Chattahoochee, and the amount of water stored in

the ACF reservoir system dropped precipitously from March 7 through late October

2006, and Lake Lanier was unable to refill in 2006 or at any time to date in 2007. If dry

conditions continue in 2007, reservoir elevations and composite storage in the ACF Basin

could fall lower in 2007 than they did in 2006 and could, this year or in a subsequent

year, fall so low as to threaten Columbus' ability to discharge treated wastewater in

compliance with regulatory requirements.

73.     In June 2006, the Corps admitted to mistakenly releasing 22.5 billion

gallons of water from Lake Lanier, significantly decreasing the amount of water available

to maintain instream flows in the ACF Basin.

74.     On May 16, 2007, in a letter from the Corps to the Service, the Corps

announced the manner in which it would conduct "volumetric balancing of releases"

(correction for over-releases) as provided in IOP Revision I. The May 16, 2007 letter

indicated that the Corps would place a number of constraints on the volumetric balancing,

particularly at times when inflow to the ACF Basin is extremely low, thereby effectively

preventing the Corps from correcting over-releases in many or all instances when the

- 19 -

70.    In a Finding of No Significant Impact dated March 6, 2007, the Corps concluded that IOP Revision 3 "would have no significant environmental human impacts. Therefore, an environmental impact statement is not required."

71.    In the March 2007 Environmental Assessment, the Corps stated that "[t]he proposed action [Revision 3] is not a new water control plan for Woodruff Dam[.]"

## The Corps' Over-Releases

72.    As a result of the Corps' application of the IOP, the Corps increased releases of water from reservoirs in the Chattahoochee, and the amount of water stored in the ACF reservoir system dropped precipitously from March 7 through late October 2006, and Lake Lanier was unable to refill in 2006 or at any time to date in 2007. If dry conditions continue in 2007, reservoir elevations and composite storage in the ACF Basin could fall lower in 2007 than they did in 2006 and could, this year or in a subsequent year, fall so low as to threaten Columbus' ability to discharge treated wastewater in compliance with regulatory requirements.

73.    In June 2006, the Corps admitted to mistakenly releasing 22.5 billion gallons of water from Lake Lanier, significantly decreasing the amount of water available to maintain instream flows in the ACF Basin.

74.    On May 16, 2007, in a letter from the Corps to the Service, the Corps announced the manner in which it would conduct "volumetric balancing of releases" (correction for over-releases) as provided in IOP Revision I. The May 16, 2007 letter indicated that the Corps would place a number of constraints on the volumetric balancing, particularly at times when inflow to the ACF Basin is extremely low, thereby effectively preventing the Corps from correcting over-releases in many or all instances when the

need to do so is the greatest. The May 16, 2007 letter also stated that the Corps' net over-release (above flows required under the IOP) since September 2006 was "appropriate since the IOP minimum release schedule is a minimum flow schedule rather than a target flow schedule," thereby contradicting the principle that over-releases are to be avoided or corrected.

## Instream Flows at Columbus

75.    CWW operates its wastewater discharge operations in compliance with an NPDES permit issued by the State of Georgia. For purposes of determining the requirements of this permit, the Georgia EPD has determined the "critical low flow" in the Chattahoochee at Columbus to be 1150 cfs.

76.    In the context of Federal Energy Regulatory Commission licensing proceedings for Georgia Power hydroelectric facilities near Columbus, the Georgia EPD and the Alabama Office of Water Resources stated that an instantaneous instream flow of 800 cfs, a daily average flow of 1,350 cfs, and a weekly average flow of 1,850 cfs were necessary to maintain water quality standards at Columbus.

77.    USGS water gage # 02341505 ("the Columbus gage"), located in the Chattahoochee just downstream from Columbus, measures instream flows of the Chattahoochee at Columbus.

78.    Each USGS gage is rated for accuracy. The USGS rates the Columbus gage "fair." USGS rates a gage "fair" if its instantaneous flow readings are within 15 percent of the true instream flow at least 95 percent of the time.

79.    During 2006 and 2007, the Columbus gage recorded numerous, repeated periods of low flow, including but not limited to:

need to do so is the greatest. The May 16, 2007 letter also stated that the Corps' net over-release (above flows required under the IOP) since September 2006 was "appropriate since the IOP minimum release schedule is a minimum flow schedule rather than a target flow schedule," thereby contradicting the principle that over-releases are to be avoided or corrected.

## Instream Flows at Columbus

75.    CWW operates its wastewater discharge operations in compliance with an NPDES permit issued by the State of Georgia.   For purposes of determining the requirements of this permit, the Georgia EPD has determined the "critical low flow" in the Chattahoochee at Columbus to be 1150 cfs.

76.    In the context of Federal Energy Regulatory Commission licensing proceedings for Georgia Power hydroelectric facilities near Columbus, the Georgia EPD and the Alabama Office of Water Resources stated that an instantaneous instream flow of 800 cfs, a daily average flow of 1,350 cfs, and a weekly average flow of 1,850 cfs were necessary to maintain water quality standards at Columbus.

77.    USGS water gage # 02341505 ("the Columbus gage"), located in the Chattahoochee just downstream from Columbus, measures instream flows of the Chattahoochee at Columbus.

78.    Each USGS gage is rated for accuracy.  The USGS rates the Columbus gage "fair."  USGS rates a gage "fair" if its instantaneous flow readings are within 15 percent of the true instream flow at least 95 percent of the time.

79.    During 2006 and 2007, the Columbus gage recorded numerous, repeated periods of low flow, including but not limited to:

a.   Instantaneous flow below 800 cfs for extended periods in October and November 2006, with instantaneous flows dropping as low as 103 cfs.

b.   Average daily flow below 1,350 cfs on August 10, 11, 12, 13, 14, 15, 16, 18, 19, and 20, 2006.

c.   Average daily flow at or below 1160 cfs on August 10, 13, 18, and 19, 2006.

d.   Average weekly flow below the target weekly minimum flow of 1,850 cfs during August 11-22, 2006.

e.   Instantaneous flow below 800 cfs for numerous periods during February 16-27, 2007, with flows dropping as low as 551 cfs.

80.   The low-flow readings described in the preceding paragraph are too numerous and too low to be accounted for by measuring error in the Columbus gage.

81.   These low instantaneous and average flow levels at Columbus are the result of the Corps' implementation of the IOP, and its lack of a current water control plan for the ACF Basin.

82.   If the Corps' actions continue, the Corps' operation of its projects will diminish instream flows in the ACF River Basin, thereby causing serious and immediate harm to CWW and its customers. This harm includes, *inter alia*, the overall degradation of water quality, impairment of CWW's ability to discharge treated wastewater in compliance with regulatory requirements, and impairment of CWW's ability to conduct and rely upon long range planning and analysis. A reduction in the flows in the Chattahoochee River below the critical low flows assumed by CWW's permits could

    a.  Instantaneous flow below 800 cfs for extended periods in October and November 2006, with instantaneous flows dropping as low as 103 cfs.

    b.  Average daily flow below 1,350 cfs on August 10, 11, 12, 13, 14, 15, 16, 18, 19, and 20, 2006.

    c.  Average daily flow at or below 1160 cfs on August 10, 13, 18, and 19, 2006.

    d.  Average weekly flow below the target weekly minimum flow of 1,850 cfs during August 11-22, 2006.

    e.  Instantaneous flow below 800 cfs for numerous periods during February 16-27, 2007, with flows dropping as low as 551 cfs.

80.    The low-flow readings described in the preceding paragraph are too numerous and too low to be accounted for by measuring error in the Columbus gage.

81.    These low instantaneous and average flow levels at Columbus are the result of the Corps' implementation of the IOP, and its lack of a current water control plan for the ACF Basin.

82.    If the Corps' actions continue, the Corps' operation of its projects will diminish instream flows in the ACF River Basin, thereby causing serious and immediate harm to CWW and its customers. This harm includes, *inter alia*, the overall degradation of water quality, impairment of CWW's ability to discharge treated wastewater in compliance with regulatory requirements, and impairment of CWW's ability to conduct and rely upon long range planning and analysis. A reduction in the flows in the Chattahoochee River below the critical low flows assumed by CWW's permits could

result in changes to CWW permit requirements such that CWW would have to spend millions of dollars to modify its facilities.

## COUNT ONE: FAILURE TO ADOPT
## WATER CONTROL PLANS FOR THE ACF BASIN

83.     The Administrative Procedures Act authorizes judicial review of agency action and inaction. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.  The APA provides that a reviewing court shall:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law[.]

5 U.S.C. § 706.

84.     Pursuant to 33 C.F.R. § 222.5(f)(1), the Corps is required to prepare a water control plan for "reservoirs, locks and dams, reregulation and major control structures and interrelated systems to conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports."

85.     The Corps has failed to update water control plans for the ACF Basin as required under 33 C.F.R. § 222.5(f)(1) and refused to commit to updating such water control plans by any date certain.

86.     By the Corps' own admission, neither the IOP nor any of its revisions is a substitute for a water control plan for the ACF Basin.  However, the IOP does constrain

result in changes to CWW permit requirements such that CWW would have to spend millions of dollars to modify its facilities.

## COUNT ONE: FAILURE TO ADOPT
## WATER CONTROL PLANS FOR THE ACF BASIN

83.    The Administrative Procedures Act authorizes judicial review of agency action and inaction. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA provides that a reviewing court shall:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law[.]

5 U.S.C. § 706.

84.    Pursuant to 33 C.F.R. § 222.5(f)(1), the Corps is required to prepare a water control plan for "reservoirs, locks and dams, reregulation and major control structures and interrelated systems to conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports."

85.    The Corps has failed to update water control plans for the ACF Basin as required under 33 C.F.R. § 222.5(f)(1) and refused to commit to updating such water control plans by any date certain.

86.    By the Corps' own admission, neither the IOP nor any of its revisions is a substitute for a water control plan for the ACF Basin.  However, the IOP does constrain

the releases that may and must be made from Corps reservoirs upstream from Woodruff Dam, to the detriment of users in the Middle Chattahoochee, such as CWW.

87.    Although Corps modeling used in support of the IOP assumes certain flow levels at Columbus, no Corps plan for the management of any project in the ACF Basin prescribes a particular minimum flow level or flow regime for Columbus or for the Corps projects immediately upstream from Columbus.

88.    The Corps lack of a Water Control Plan dictating such flow levels or such a flow regime had impaired CWW's ability to conduct and rely upon long range planning and analysis, and will result in the overall degradation of water quality and impairment of CWW's ability to discharge stormwater and treated wastewater in compliance with regulatory requirements.

89.    Furthermore, unless the Corps is compelled to develop a Water Control Plan specifying to some degree of certainty how navigational flows in the Apalachicola River are to be managed, the City of Columbus will continue to be unable to pursue the Oxbow Meadows project.

## COUNT TWO: NATIONAL ENVIRONMENTAL POLICY ACT

90.    The National Environmental Policy Act ("NEPA") requires every Federal agency to consider the environmental impact of any "major Federal actions significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(2)(C).  "Major Federal actions" include actions with effects that may be major and that are potentially subject to Federal control and responsibility.  40 C.F.R. § 1508.18.

91.    Section 102(2)(C) of NEPA requires all federal agencies, including the Corps, to:

the releases that may and must be made from Corps reservoirs upstream from Woodruff Dam, to the detriment of users in the Middle Chattahoochee, such as CWW.

87.     Although Corps modeling used in support of the IOP assumes certain flow levels at Columbus, no Corps plan for the management of any project in the ACF Basin prescribes a particular minimum flow level or flow regime for Columbus or for the Corps projects immediately upstream from Columbus.

88.     The Corps lack of a Water Control Plan dictating such flow levels or such a flow regime had impaired CWW's ability to conduct and rely upon long range planning and analysis, and will result in the overall degradation of water quality and impairment of CWW's ability to discharge stormwater and treated wastewater in compliance with regulatory requirements.

89.     Furthermore, unless the Corps is compelled to develop a Water Control Plan specifying to some degree of certainty how navigational flows in the Apalachicola River are to be managed, the City of Columbus will continue to be unable to pursue the Oxbow Meadows project.

## COUNT TWO: NATIONAL ENVIRONMENTAL POLICY ACT

90.     The National Environmental Policy Act ("NEPA") requires every Federal agency to consider the environmental impact of any "major Federal actions significantly affecting the quality of the human environment[.]"   42 U.S.C. § 4332(2)(C).  "Major Federal actions" include actions with effects that may be major and that are potentially subject to Federal control and responsibility.  40 C.F.R. § 1508.18.

91.     Section 102(2)(C) of NEPA requires all federal agencies, including the Corps, to:

> Include in every recommendation or report on . . . major
> Federal actions significantly affecting the quality of the
> human environment, a detailed statement by the responsible
> official on–
> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be
> avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's
> environment and the maintenance and enhancement of
> long-term productivity, and
> (v) any irreversible and irretrievable commitments of
> resources which would be involved in the proposed action
> should it be implemented.

42 U.S.C. § 4332(2)(C). This detailed statement, which is required before a major

federal action significantly affecting the quality of the human environment may be

undertaken, is called an Environmental Impact Statement ("EIS"). If the Corps finds that

an EIS is not required because a proposed action will not significantly affect the quality

of the human environment, the Corps must at least prepare an Environmental Assessment

("EA") and properly make a finding of "no significant impact," explaining the agency's

decision. *Id.*; 40 C.F.R. §1501.4.

92.     The Council on Environmental Quality ("CEQ") has promulgated NEPA

regulations which are binding on all Federal agencies. 40 C.F.R. § 1500.3. Under CEQ

regulations, a Federal agency is required to prepare an environmental assessment of

actions not categorically excluded from NEPA compliance, providing sufficient evidence

and analysis for determining whether the agency must prepare an environmental impact

statement. *See* 40 C.F.R. § 1508.9(a)(1); 33 C.F.R. § 230.10. Unless the environmental

assessment results in a Finding of No Significant Impact ("FONSI"), the agency must

prepare an environmental impact statement. 33 C.F.R. § 230.11. When an EA concludes

> Include in every recommendation or report on . . . major
> Federal actions significantly affecting the quality of the
> human environment, a detailed statement by the responsible
> official on–
> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be
> avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's
> environment and the maintenance and enhancement of
> long-term productivity, and
> (v) any irreversible and irretrievable commitments of
> resources which would be involved in the proposed action
> should it be implemented.

42 U.S.C. § 4332(2)(C). This detailed statement, which is required before a major

federal action significantly affecting the quality of the human environment may be

undertaken, is called an Environmental Impact Statement ("EIS"). If the Corps finds that

an EIS is not required because a proposed action will not significantly affect the quality

of the human environment, the Corps must at least prepare an Environmental Assessment

("EA") and properly make a finding of "no significant impact," explaining the agency's

decision. *Id.*; 40 C.F.R. §1501.4.

92.    The Council on Environmental Quality ("CEQ") has promulgated NEPA

regulations which are binding on all Federal agencies. 40 C.F.R. § 1500.3.   Under CEQ

regulations, a Federal agency is required to prepare an environmental assessment of

actions not categorically excluded from NEPA compliance, providing sufficient evidence

and analysis for determining whether the agency must prepare an environmental impact

statement. *See* 40 C.F.R. § 1508.9(a)(1); 33 C.F.R. § 230.10. Unless the environmental

assessment results in a Finding of No Significant Impact ("FONSI"), the agency must

prepare an environmental impact statement. 33 C.F.R. § 230.11. When an EA concludes

with a FONSI, the agency is required to explain why an action will not have a significant impact on the human environment. 40 C.F.R. § 1508.13.

93.    According to the Corps' own NEPA regulations, "Actions normally requiring an EIS" include "Proposed changes in projects which increase size substantially or add additional purposes" and "Proposed major changes in the operation and/or maintenance of completed projects." 33 C.F.R. § 230.6.

94.    The IOP is a "major Federal action[s] significantly affecting the quality of the human environment" within the meeting with NEPA.

95.    The Corps failed to prepare an EIS in conjunction with the IOP, as required by NEPA.

96.    The Corps prepared the Environmental Assessments on the IOP only after developing, adopting, and implementing the IOP.

97.    The Corps' findings in its NEPA documentation that the IOP will not significantly affect reservoir levels, water supply, recreation, and other needs in and from Lake Lanier, West Point Lake, and Lake Walter F. George were clearly erroneous.

98.    The manner in which the Corps undertook its NEPA analysis on the IOP, and the contents of its NEPA documentation on the IOP, reflects the Corps' failure to take the "hard look" at the impact of the IOP on the ACF Reservoirs, and other needs in the ACF Basin that NEPA requires.

99.    The Corps' failure to discharge its duties under NEPA wrongfully deprived CWW of the opportunity to participate in the Corps' management of vital natural resources in which CWW has direct and substantial interests. CWW has direct

with a FONSI, the agency is required to explain why an action will not have a significant impact on the human environment. 40 C.F.R. § 1508.13.

93.    According to the Corps' own NEPA regulations, "Actions normally requiring an EIS" include "Proposed changes in projects which increase size substantially or add additional purposes" and "Proposed major changes in the operation and/or maintenance of completed projects." 33 C.F.R. § 230.6.

94.    The IOP is a "major Federal action[s] significantly affecting the quality of the human environment" within the meeting with NEPA.

95.    The Corps failed to prepare an EIS in conjunction with the IOP, as required by NEPA.

96.    The Corps prepared the Environmental Assessments on the IOP only after developing, adopting, and implementing the IOP.

97.    The Corps' findings in its NEPA documentation that the IOP will not significantly affect reservoir levels, water supply, recreation, and other needs in and from Lake Lanier, West Point Lake, and Lake Walter F. George were clearly erroneous.

98.    The manner in which the Corps undertook its NEPA analysis on the IOP, and the contents of its NEPA documentation on the IOP, reflects the Corps' failure to take the "hard look" at the impact of the IOP on the ACF Reservoirs, and other needs in the ACF Basin that NEPA requires.

99.    The Corps' failure to discharge its duties under NEPA wrongfully deprived CWW of the opportunity to participate in the Corps' management of vital natural resources in which CWW has direct and substantial interests. CWW has direct

and substantial interests in the Corps' compliance with the provisions of NEPA and is within the zone of interests protected by NEPA.

100.   The Corps' adoption and application of the IOP without fulfilling NEPA requirements has caused CWW actual and substantial injury by reducing the amount of water stored in the ACF Reservoirs in Georgia during 2006 and 2007 far below levels that are customary and prudent and threatening the ability of the ACF Reservoirs and the Chattahoochee River to meet Georgia's needs.   These reductions caused instream flow levels at Columbus to drop below the levels required by CWW to effectively treat its municipal waste water.

## COUNT THREE:  WATER RESOURCES DEVELOPMENT ACT (Failure to Provide Public Review and Comment)

101.   The Water Resources Development Acts of 1988 and 1990, as codified at 33 U.S.C. § 2312, require that:

> Before the Secretary [of the Army] may make changes in the operation of any reservoir which will result in or require a reallocation of storage space in such reservoir or will significantly affect any project purpose, the Secretary shall provide an opportunity for public review and comment.

102.   Under the Flood Control Act of 1962, P.L. 87-874, 76 Stat. 1180, ensuring water quality is one of the authorized purposes of West Point Lake, the Corps dam immediately upstream from Columbus.

103.   The Corps' implementation of the IOP threatens water quality at Columbus, thus significantly affecting water quality downstream of West Point Lake.

104.   In promulgating the IOP and its subsequent revisions, the Corps never afforded any opportunity for public review or comment.

- 26 -

and substantial interests in the Corps' compliance with the provisions of NEPA and is within the zone of interests protected by NEPA.

100.    The Corps' adoption and application of the IOP without fulfilling NEPA requirements has caused CWW actual and substantial injury by reducing the amount of water stored in the ACF Reservoirs in Georgia during 2006 and 2007 far below levels that are customary and prudent and threatening the ability of the ACF Reservoirs and the Chattahoochee River to meet Georgia's needs. These reductions caused instream flow levels at Columbus to drop below the levels required by CWW to effectively treat its municipal waste water.

## COUNT THREE: WATER RESOURCES DEVELOPMENT ACT
## (Failure to Provide Public Review and Comment)

101.    The Water Resources Development Acts of 1988 and 1990, as codified at 33 U.S.C. § 2312, require that:

> Before the Secretary [of the Army] may make changes in the operation of any reservoir which will result in or require a reallocation of storage space in such reservoir or will significantly affect any project purpose, the Secretary shall provide an opportunity for public review and comment.

102.    Under the Flood Control Act of 1962, P.L. 87-874, 76 Stat. 1180, ensuring water quality is one of the authorized purposes of West Point Lake, the Corps dam immediately upstream from Columbus.

103.    The Corps' implementation of the IOP threatens water quality at Columbus, thus significantly affecting water quality downstream of West Point Lake.

104.    In promulgating the IOP and its subsequent revisions, the Corps never afforded any opportunity for public review or comment.

- 26 -

105.    The Corps' failure to comply with the public participation requirements of the Water Resources Development Acts has wrongly denied CWW the opportunity to participate in the Corps' management of vital natural resources in which CWW has direct and substantial interests, including riparian and other vested rights.

106.    The Corps' adoption and application of the IOP without regard to the public notice and participation requirements of the Water Resources Development Act has caused CWW actual and substantial injury by reducing the amount of water stored in the ACF Reservoirs in Georgia during 2006 and 2007 far below levels that are customary and prudent and threatening the ability of the ACF Reservoirs and the Chattahoochee River to meet Georgia's needs.    These reductions caused instream flow levels at Columbus to drop below the levels required by CWW to effectively treat its municipal waste water.

## **PRAYER FOR RELIEF**

Wherefore, plaintiff Columbus Water Works respectfully requests that this Court grant it the following relief:

a.    Declare that the acts and omissions of the Corps, as described in this Complaint, are diminishing and/or will diminish CWW's vested rights in the historic flows and quality of the waters of the Chattahoochee River, and, as a result, are causing and/or threaten to cause CWW irreparable harm;

b.    Declare that the Corps' acts and omissions, as described in this Complaint, constitute "final agency action" reviewable under the APA, and are in violation of the applicable federal law, including NEPA and the Water Resources Development Act, and all implementing regulations;

- 27 -

105.   The Corps' failure to comply with the public participation requirements of the Water Resources Development Acts has wrongly denied CWW the opportunity to participate in the Corps' management of vital natural resources in which CWW has direct and substantial interests, including riparian and other vested rights.

106.   The Corps' adoption and application of the IOP without regard to the public notice and participation requirements of the Water Resources Development Act has caused CWW actual and substantial injury by reducing the amount of water stored in the ACF Reservoirs in Georgia during 2006 and 2007 far below levels that are customary and prudent and threatening the ability of the ACF Reservoirs and the Chattahoochee River to meet Georgia's needs.   These reductions caused instream flow levels at Columbus to drop below the levels required by CWW to effectively treat its municipal waste water.

## PRAYER FOR RELIEF

Wherefore, plaintiff Columbus Water Works respectfully requests that this Court grant it the following relief:

a.   Declare that the acts and omissions of the Corps, as described in this Complaint, are diminishing and/or will diminish CWW's vested rights in the historic flows and quality of the waters of the Chattahoochee River, and, as a result, are causing and/or threaten to cause CWW irreparable harm;

b.   Declare that the Corps' acts and omissions, as described in this Complaint, constitute "final agency action" reviewable under the APA, and are in violation of the applicable federal law, including NEPA and the Water Resources Development Act, and all implementing regulations;

- 27 -

c.    Issue an order setting aside the IOP for violation of NEPA and the Water Resources Development Act;

d.    Issue an order enjoining the Corps from continuing to operate in accordance with the IOP;

e.    Issue an order enjoining the Corps to initiate the process of updating the Water Control Manual for the ACF Reservoirs and to complete that process within three years;

f.    Grant the CWW appropriate interim injunctive relief to protect CWW from irreparable harm pending the outcome of this litigation;

g.    Award CWW attorneys fees and costs; and

h.    Award such other further relief as the Court may deem just and proper to protect the interests of the City of Columbus and Columbus Water Works.

Respectfully submitted, this 13th day of August 2007.

/s/ Lee A. DeHihns, III
Lee A. DeHihns, III
Georgia Bar No. 216259
Alston & Bird, LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
E-mail: lee.dehihns@alston.com

c.     Issue an order setting aside the IOP for violation of NEPA and the Water

Resources Development Act;

d.     Issue an order enjoining the Corps from continuing to operate in

accordance with the IOP;

e.     Issue an order enjoining the Corps to initiate the process of updating the

Water Control Manual for the ACF Reservoirs and to complete that process

within three years;

f.     Grant the CWW appropriate interim injunctive relief to protect CWW

from irreparable harm pending the outcome of this litigation;

g.     Award CWW attorneys fees and costs; and

h.     Award such other further relief as the Court may deem just and proper to

protect the interests of the City of Columbus and Columbus Water Works.

Respectfully submitted, this 13th day of August 2007.

<div align="center" style="text-align:right">

/s/ Lee A. DeHihns, III
Lee A. DeHihns, III
Georgia Bar No. 216259
Alston & Bird, LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
E-mail: lee.dehihns@alston.com

</div>

/s/ J. Barrington Vaught
J. Barrington Vaught
Georgia Bar No. 726500
Hatcher, Stubbs, Land, Hollis, &
    Rothschild, LLP
6310-A Bradley Park Drive
Columbus, Georgia 31904
Phone: (706) 243-6227
Fax: (706) 243-5227
E-mail: jbv@hatcherstubbs.com

/s/ J. Barrington Vaught
J. Barrington Vaught
Georgia Bar No. 726500
Hatcher, Stubbs, Land, Hollis, &
  Rothschild, LLP
6310-A Bradley Park Drive
Columbus, Georgia 31904
Phone: (706) 243-6227
Fax: (706) 243-5227
E-mail: jbv@hatcherstubbs.com